Page 109

1  March of 2005?
2  A.  Yes, I have.  My earning potential could have
3  been more had I been able to exercise another option.
4  Q.  How long did the classroom work last during
5  the TCA?
6  A.  The classroom portion of it, we used to just
7  come in maybe like once a week.  It was more hands-on.
8  We spent more time in the field than we did in the
9  classroom.
10  Q.  Did Mr. Fox do all the field work with you?
11  A.  He did all the field work with me.  He also
12  evaluated me as a trainer.
13  Q.  Did he evaluate you positively?
14  A.  Yes, he did.
15  Q.  Who did the classroom work, the teaching?
16  A.  It was Jimmy Horn.  He did -- I think he
17  started it off.  And who did the rest of it?  We had
18  people filling in every once in a while.  Like Mason
19  may have done a few, Roman.
20  Q.  Do you have any complaints about the TCA,
21  other than not getting your LG endorsement?
22  A.  No.  The TCA program was very effective.  It
23  was very informative.  Like I said, the service that
24  you provide as a tankerman one-on-one with the
25  refineries is no problem there.  So no, I didn't have

Page 110

1  any problems with the course or understanding what I
2  needed to do.
3  Q.  Tell me why you think not getting the LG
4  endorsement had anything to do with your race?
5  A.  Why do I think that it had something to do
6  with my race?
7  Q.  Yes.  Do you think that?  Do you think it had
8  something to do with your race, or do you think it was
9  maybe someone didn't do the paperwork right?
10  A.  I believe, because of the strange
11  relationship that me and Dela Cruz had, just me being
12  able to judge for myself without -- and experience the
13  things that I experienced on my own that it was
14  race-related.
15  Q.  Is that just your subjective belief?
16  A.  Yes, it is.
17  Q.  I want to move for a few minutes out of the
18  TCA and into your actual employment relationship.  And
19  I'm going to hand to you and your attorney a document
20  I've marked as Exhibit 6.
21      (McKenzie Exhibit No. 6 marked.)
22  Q.  Is this the Employment Application you filled
23  out when you went to work for Petroleum Service
24  Corporation?
25  A.  Yes, it is.

Page 111

1  Q.  And the handwritten material on page 1 --
2  actually, all the handwritten material is yours?
3  A.  Yes, it is.
4  Q.  That's your signature at the bottom of
5  page 3?
6  A.  Yes, it is.
7  Q.  Now, it looks like -- under date, it looks
8  like the month is there, but nothing else.  Do you
9  know why?
10  A.  Where?
11  Q.  On page 3, right beside your signature.
12  A.  No.  I can't recall what that's about.
13  Q.  Do you remember -- we know that you signed
14  the enrollment agreement for the TCA on November 15,
15  2004.  Did you complete an Employment Application at
16  the same time or did the Employment Application come
17  later?
18  A.  I want to say -- I don't know.  I don't
19  recall.  Let me see.  I think once my information came
20  back for the tuition being approved, is when I filled
21  out the Employment Application.
22  Q.  Let's look on the first page.  And I'm just
23  going to point to you so we can get there quickly.  It
24  says -- well, it says, "Where did you hear about us?"
25  And you checked off a PSC employee.  That was

Page 112

1  Mr. Duncan?
2  A.  Yes, it was.
3  Q.  Look at the second page, if you would.  Here
4  you list your employment history and the first one
5  listed is Metro.
6  A.  Okay.
7  Q.  Who is Metro?
8  A.  That's -- I was a bus operator for Metro.
9  Q.  The bus company?
10  A.  Yeah.  I was a city bus driver.
11  Q.  You didn't mention them earlier, did you?
12  A.  No, I sure didn't.
13  Q.  How long were you a bus driver for Metro?
14  A.  It looks like seven months, six months,
15  something like that.
16  Q.  Who is your supervisor that you have listed
17  there?
18  A.  Mr. Armstrong.
19  Q.  Now, why did you leave Metro?
20  A.  I totally forgot about it, to be honest with
21  you.
22  Q.  Why did you leave there?
23  A.  I just resigned.  Actually, I applied for a
24  job at Union Pacific and I thought I was going to get
25  that particular job.  That's why.  That didn't work

Sunbelt Reporting & Litigation Services
Houston   Austin   Corpus Christi   Dallas/Fort Worth   East Texas   San Antonio

Page 113

1  out.
2  Q.  You resigned voluntarily?
3  A.  Yes, I did.
4  Q.  Did you have any problems in your employment
5  with Metro?                                              14:05
6  A.  No, none at all.  None at all.
7  Q.  And then after Metro -- actually, before
8  Metro because I think you're going in reverse
9  chronological order, who do you have listed there as
10 your employer?                                           14:05
11 A.  It's a wrecker service, Guardian -- Guardian
12 Wrecker.
13 Q.  You didn't mention them earlier either in the
14 deposition, did you?
15 A.  Yeah.                                                14:05
16 Q.  How long did you work for Guardian?
17 A.  I didn't work with them long.  I was
18 working -- it was like a body shop/wrecker-type
19 company.
20 Q.  What happened?  Why did your employment there  14:05
21 end?
22 A.  Because it was like commission.  You had to
23 come to accident scenes and whatever.
24 Q.  This is different from the tow truck company?
25 A.  Yeah, that's different from the tow truck      14:06

Page 114

1  company.
2  Q.  You left this job voluntarily also?
3  A.  Yeah, I left that voluntary.
4  Q.  No disciplinary action?
5  A.  No.                                                  14:06
6  Q.  The next one that you listed is Lucent.
7  A.  That's Lucent, yes.
8  Q.  We have talked about that one?
9  A.  Right.
10 Q.  You were employed with Lucent from about May    14:06
11 of '96 to April of 2003.
12 A.  Yes, that's about right.
13         (McKenzie Exhibit 7 marked.)
14 Q.  Look at exhibit -- sorry.  I'm going to hand
15 to you and your attorney a document that I marked as    14:07
16 Exhibit 7.  Is that your signature -- well, actually
17 one, two, three, four lines down there?
18 A.  Yes, it is.
19 Q.  And you dated this November 29, 2004?
20 A.  Yes.                                                 14:07
21 Q.  Is that the time -- do you recall filling --
22 this is acknowledging that you're getting certain
23 policies.
24 A.  Right.
25 Q.  Do you remember that?                                14:07

Page 115

1  A.  Yes, I remember this.
2  Q.  Did you sign off on these the same time you
3  filled out your application?  Do you remember?
4  A.  That I don't remember.  It's been -- I know
5  this came after I was hired.                             14:07
6  Q.  Okay.
7  A.  I had to be hired in order to receive these
8  documents.  That's part of going into the orientation,
9  prior to the TCA program.
10 Q.  Do you remember when you actually started the   14:08
11 TCA program?
12 A.  Not exactly.
13 Q.  Okay.
14 A.  Not exactly.
15 Q.  If you look at Exhibit 7, I mean, it looks      14:08
16 like you signed off on this on November 29, 2004.  The
17 first one says you received and read the PSC ethics
18 policy.  Do you remember getting that one?
19 A.  Yes, I do remember that one.
20 Q.  And part of that policy required you to be     14:08
21 honest in your dealings with PSC.  Correct?
22 A.  Yes.
23 Q.  Now, the second one talks about the workplace
24 harassment policy.  Do you remember getting a copy of
25 the workplace harassment policy?                         14:08

Page 116

1  A.  Yes.
2  Q.  Do you remember it saying that PSC prohibited
3  all forms of harassment in the workplace, including
4  racial harassment?
5  A.  Yes.                                                 14:09
6  Q.  Do you contend that you were harassed on the
7  basis of your race during your employment with PSC?
8  A.  Yes.
9  Q.  By whom?
10 A.  By -- under the direction of Mason Dela Cruz.   14:09
11 Q.  Why do you content that you were harassed?
12 He never used racial terminology toward you or racial
13 slurs, did he?
14 A.  No.  It was constantly feeling that my job
15 was in jeopardy and constantly being reprimanded.  And   14:09
16 from conversations that I gathered after graduation
17 from the TCA program.  And just how I was treated
18 individually.  And how I noticed it being a little
19 different than what others were allowed to or had
20 assess to.                                               14:09
21 Q.  What others are you talking about?
22 A.  I'm talking about other white tankermen who
23 were allowed to get their LG with no problem.
24 Q.  Who specifically?
25 A.  Robert.  I keep forgetting his last name.       14:10

## Page 117

1  Q.  Franks?
2  A.  Robert Franks.
3  Q.  Anyone else?
4  A.  You have -- you know, just hearing about,
5  like I said, even with the suspension thing, that          14:10
6  being a little harsh, that could have been handled
7  differently in my opinion. Meaning it didn't take a
8  three-day suspension. Like I said, it's always
9  been -- coming straight out of graduation, it just
10 appeared that my relationship with Dela Cruz was           14:10
11 always strained. That's it. And I felt that I was
12 being singled out. I just felt that I was being -- I
13 was being singled out and I was being harassed. And
14 the only conclusion that I can draw, because I haven't
15 done anything wrong -- I carry myself professionally.      14:11
16 I consider myself a team player. I just felt like it
17 couldn't be no other reason but the fact that I was
18 African-American.
19 Q.  Okay. That's going back to what you said.
20 That's just the subjective belief that you have?          14:11
21 A.  Based on how I was treated.
22 Q.  Now, the next entry says that you got an
23 employee handbook. Do you remember getting an
24 employee handbook?
25 A.  If it's -- yes, I do.                                 14:11

## Page 118

1  Q.  Exhibit 2 is the catalog for the TCA. Let me
2  go ahead and --
3  A.  Show me what it looks like.
4       (McKenzie Exhibit 8 marked.)
5  Q.  I'm going to hand to you and your attorney a          14:12
6  document I've marked as Exhibit 8. It's a fairly
7  thick exhibit. I can't tell how many pages. It looks
8  like it's Bates labeled PSC 00252 through PSC 00297.
9  Do you remember getting a handbook that looked
10 something like this?                                      14:12
11 A.  Just bear with me for a second.
12 Q.  Sure.
13 A.  Yes, I did.
14 Q.  When you signed Exhibit 7, you agreed to
15 abide by the provisions of the employee handbook.         14:13
16 Correct?
17 A.  Yes.
18 Q.  Let's take -- I want to take a look at a
19 couple of provisions in the handbook itself. Do you
20 remember who gave you the handbook? Was it Christina?     14:13
21 A.  I want to say it was Christina. As we went
22 over some of these items, we would sign off on them as
23 she gave it to us and kind of went over it briefly.
24 Q.  So it was kind of like in an orientation?
25 A.  Yes, it was an orientation session basically.         14:13

## Page 119

1  That's the word.
2  Q.  Did she go through some of the provisions of
3  the handbook?
4  A.  She went through some of it, yes.
5  Q.  Did anyone besides Christina -- I know we've          14:13
6  talked about in the context of the TCA. But did
7  anyone interview you for employment before you were
8  officially hired by Petroleum Service Corporation?
9  A.  Christina did, yes.
10 Q.  Is she the one that hired you and said,               14:14
11 "Great, good to have you on board," or whatever?
12 A.  Yes.
13 Q.  I'm sorry?
14 A.  Yes.
15 Q.  Did Christina give you any reason to believe          14:14
16 that Petroleum Service Corporation was not interested
17 in hiring black employees?
18 A.  No.
19 Q.  Now, let's look, if you would, at Section 2-2
20 of the handbook, which the Bates labeled page is PSC      14:14
21 00260. Are you with me?
22 A.  Yes. 2-3?
23 Q.  2-2.
24 A.  PSC 00260.
25 Q.  It's called Equal Opportunity Policy.                 14:15

## Page 120

1  A.  Yes.
2  Q.  Do you remember looking at this policy or
3  going over it?
4  A.  I remember going over it.
5  Q.  Did you go over it with Christina?                    14:15
6  A.  I believe I did.
7  Q.  Now, I want you to look -- did you -- you
8  understood that PSC's general policy is that people
9  are not going to be discriminated against. Correct?
10 A.  Well, I understand that to be the policy,             14:15
11 yes.
12 Q.  And as I understand your testimony, the only
13 person you're accusing of violating that policy is
14 Mason Dela Cruz. Is that accurate?
15 A.  Well, yes, I would say that.                          14:15
16 Q.  Now, look in -- and I think, if I recall your
17 testimony correctly, the first time you felt that
18 Mr. Dela Cruz discriminated against you or had
19 something against you is when he made that comment
20 following the TCA graduation. Is that accurate?          14:15
21 A.  Yeah, that's accurate.
22 Q.  Now, if you look at the third paragraph of
23 this EEO policy it says -- in the second sentence, the
24 third line down says, "Any employee having a question
25 about this policy or a concern that the policy is not    14:16

Sunbelt Reporting & Litigation Services
Houston   Austin   Corpus Christi   Dallas/Fort Worth   East Texas   San Antonio

Page 121

1  being followed should immediately contact the human
2  resources director.  Each employee has both a right
3  and a duty to report conduct which he or she believes
4  may constitute unlawful discrimination."
5       At any time during your employment with PSC,          14:16
6  did you ever contact the human resources department
7  and report that you felt you were being discriminated
8  against?
9     A.  No, I did not.
10    Q.  Why not?                                             14:16
11    A.  I didn't pursue it to that level because I
12  just took it upon myself to continue to do my job and
13  it was just something that I just endured during the
14  process.  I didn't take it to that level.
15    Q.  If you'll look at 4-13, which is Bates               14:17
16  labeled PSC 00294.  This is the policy prohibiting
17  harassment on the basis of sex, but on the basis of
18  race as well.  You were aware of this policy?
19    A.  Yes.
20    Q.  You never reported to the director of human          14:17
21  resources or anyone else that you felt you were being
22  harassed?
23    A.  I did not go to the director of human
24  resources.  The only thing that I did do was request
25  to get out of Mason's group early in my career.            14:17

Page 122

1     Q.  That was to Mr. Horn?
2     A.  Was to Mr. Jimmy Horn for the simple fact
3  that I wanted -- I did not like the way I was being
4  treated with Mason.  And my suggestion for me to stay
5  there, that it was just a matter of time that Mason        14:18
6  was going to -- I always felt in fear of my job or
7  whatever.  So I took it to that level, just to get out
8  of -- get out of his group so that I could have an
9  opportunity to be the tankerman that I know I can be.
10    Q.  What did Mr. Horn say?                               14:18
11    A.  He said that let him think about it and he'll
12  make a determination.  He was going to take Mason's
13  feelings into consideration.  As I followed up on it,
14  they decided that I should stay in Mason's group.
15    Q.  Did you tell Mr. Horn that you felt you were         14:18
16  being discriminated against or did you just tell him
17  that you thought Mason wasn't being fair to you?
18    A.  Well, I told him I felt that he wasn't being
19  fair to me.
20    Q.  You didn't tell him you thought it was               14:18
21  because of your race?
22    A.  No, I did not.
23    Q.  I want to go back to an answer you gave a
24  couple of minutes ago about the LG endorsement.  There
25  was no time that Mr. Dela Cruz told you that he would      14:19

Page 123

1  not allow you to get an LG endorsement, did he?
2     A.  No.
3     Q.  Every time you asked him or the few times you
4  asked him, he said, "Okay, I'll look into it," but
5  then he just never did?                                    14:19
6     A.  He never did, exactly.
7     Q.  Is there anything he ever said to you that
8  indicated to you that he wouldn't do it or was it just
9  the fact that he didn't do it?
10    A.  Well, it was the fact that he didn't respond.       14:19
11  I wasn't the only person pushing the LG issue.  So
12  that led me to believe that that was something that he
13  was not going to.
14    Q.  Who else was pushing the LG issue?
15    A.  Well, you have people who left the company          14:20
16  who was pushing LG issues.  Mike Monroe.  But I know
17  that Dwayne Batchelor documented on occasions him
18  expressing -- him trying to get his LG as well.
19    Q.  Whose crew did Mr. Monroe work on?
20    A.  I'm not sure.                                       14:20
21        (McKenzie Exhibit 9 marked.)
22    Q.  Let me hand to you and your attorney a
23  document that I've marked as Exhibit 9.  It's called a
24  Transfer Record and it's got an effective date of
25  March 20, 2005.  And it indicates that you're             14:20

Page 124

1  transferring from the TCA to Houston Harbor.  Is that
2  about the time that you became a full-time tankerman
3  officially?
4     A.  Yes, I would say so because -- yes, I would
5  say so.                                                    14:21
6     Q.  What were you going to say?  You said
7  because.
8     A.  My Merchant Marine Document, the date on it,
9  it expires on 2010.  I mean February.  In order for me
10  to actively generate revenue, I would have to have had    14:21
11  my -- I had my permission through my license to
12  actually be a tankerman upon graduation.  So I'm
13  looking at the timeline.  I guess that's about the
14  right time.
15    Q.  So you actually might have been -- it might         14:21
16  have even been a little bit before this?
17    A.  Maybe.
18        (McKenzie Exhibit 10 marked.)
19    Q.  Let me hand to you and your attorney a
20  document that I marked as Exhibit 10.  This is            14:21
21  Excuse/Work Status Report.  Looks like from a doctor's
22  office.  It's dated June 21, 2005.  Is this -- it
23  basically excuses you from work, from like June 21st
24  through July.  And I can't read the date.  Is this --
25  do you recall this being the first time that you were    14:22

Page 125

1 out for the car accident?
2  A.  Yes, I believe so.
3  Q.  Who was your doctor.
4  A.  I guess this is the doctor's name here.
5 Paul.                                             14:22
6  Q.  Do you remember who you were seeing?
7  A.  I was seeing the doctor who signed this
8 document. I can't pronounce his last name.
9  Q.  Was this your personal doctor?
10 A.  No, it was not.                              14:22
11 Q.  Who sent you?
12 A.  This was a doctor that was referred to me
13 through the personal injury attorney.
14 Q.  Okay. Who is your regular doctor?
15 A.  I need a restroom break.                     14:22
16 Q.  I'm sorry. You're allowed to say let's take
17 a break.
18            MR. KIGGANS: Mr. McKenzie just
19 indicated he needs a break so we're going to take a
20 quick break.                                     14:23
21           (Break from 2:23 p.m. to 2:48 p.m.)
22 Q.  Do you have a regular doctor?
23 A.  No, I do not have a regular doctor.
24 Q.  When is the last time you saw a doctor?
25 A.  I saw a doctor maybe three days ago. I'm    14:48

Page 126

1 renewing my MMD. It's about to expire.
2  Q.  When is the last time you saw a doctor for
3 treatment for something?
4  A.  Probably since the last time of being
5 released from an accident. I haven't gone for    14:48
6 anything.
7          (McKenzie Exhibit 11 marked.)
8  Q.  Let me hand to you and your attorney a
9 document I marked as Exhibit 11. This is -- do you
10 remember, is that your signature on here?        14:49
11 A.  That is my signature.
12 Q.  Do you remember signing this?
13 A.  I do remember signing this.
14 Q.  Tell me the circumstances under which you
15 were getting wages advanced.                     14:49
16 A.  I believe -- I had an accident. Because PSC
17 would not allow me to file that under their sickness
18 policy or because I was off. They do make the
19 decision whether they will pay you for being off based
20 on your reason for being off. And I was denied sick  14:49
21 pay for being involved in an accident in which
22 actually it was an accident that I was en route on my
23 way to work.
24 Q.  Who denied you sick pay?
25 A.  I believe Mason was the point of contact with  14:50

Page 127

1 that. I had to consult with him on wages. He told me
2 that the decision was made and for me to -- I believe
3 I called the human resources department. And I
4 expressed I my concern because there was other
5 tankermen who had automobile accidents in which they  14:50
6 were paid a portion of their salary. However, I was
7 denied that opportunity and had to make an arrangement
8 for financial reasons for an advancement based on the
9 information that I had gathered from other tankermen.
10 Q.  You had been employed for less than a year at  14:50
11 this time, weren't you?
12 A.  Maybe.
13 Q.  Who did you speak to in human resources about
14 getting sick pay?
15 A.  Mr. Plack -- Page.                          14:51
16 Q.  Bloshay?
17 A.  Bloshay, yeah.
18 Q.  Rodney Bloshay?
19 A.  Yeah. Me and him communicated.
20 Q.  What did he tell you?                       14:51
21 A.  He's the one who made the arrangements to
22 advance me after I guess maybe consulting with other
23 people in the department or whatever the process is.
24 He made the determination that he would allow. It was
25 like special circumstances, whatever.           14:51

Page 128

1  Q.  Why did he tell you that you were not going
2 to get paid sick leave?
3  A.  He just told me -- he just said I was denied
4 sick leave.
5  Q.  He didn't give you a reason?                14:51
6  A.  No, did he not give me a reason. I
7 discovered in reading in one of your handbooks that
8 the reason why it's up to the discretion of the
9 company and that if you're in good standing, that they
10 do it. And at that point from reading that, it's safe  14:51
11 to assume that I wasn't in good standing.
12 Q.  You're talking about the employee handbook
13 that's been marked as Exhibit 8?
14 A.  Maybe. It's one of your documents.
15 Q.  One that we've looked at today? When do you  14:52
16 remember reading this?
17 A.  I don't have an exact date.
18 Q.  It wasn't today, though?
19 A.  No, it wasn't today.
20 Q.  You don't know whether it was in this        14:52
21 handbook?
22 A.  I read it in something that they gave me.
23 Q.  Do you know if you still have it?
24 A.  I will have to look for it. I believe I
25 still have it.                                  14:53

Page 129

1  Q. Could you provide that to your attorney?
2  A. Yes, if I can find it, I will. I'll do that.
3  Q. Do you know anyone specifically -- you
4  mentioned other tankermen who got paid sick leave.
5  Who are you talking about?    14:53
6  A. Stanley Duncan received sick pay.
7  Q. For how long?
8  A. I don't know. But it was as a result of a
9  car accident coming from work.
10 Q. You don't contend that was a race issue then,   14:53
11 do you, since Mr. Duncan is also black?
12 A. He's also black. All I can speak of is how
13 Mason Dela Cruz treated me. If he treated another
14 black person different than he treated me, I can't
15 speak on that. I can only speak for myself.    14:53
16 Q. Is there any other employee that you believe
17 got paid sick leave following a car accident besides
18 Mr. Duncan?
19 A. I cannot think of anybody where I can
20 actually say that for a fact. It's speculation again.   14:54
21 As people talk, I've heard of them paying that before.
22 Q. Who did you hear got paid?
23 A. Well, Stanley definitely told me he had
24 gotten paid.
25 Q. Okay.    14:54

Page 130

1  A. So that's all the factual information I have.
2  Q. Do you know how much wages you got advanced?
3  A. I believe it was two weeks pay.
4  Q. Did you ever pay it back?
5  A. No, I didn't. I didn't pay it back because   14:54
6  that was in lieu of me getting the settlement for lost
7  wages. I didn't get it.
8  Q. In your car accident?
9  A. In my car accident, settlement. I don't even
10 think they touched on it.    14:54
11 Q. Were you ever counseled about being
12 unavailable for work?
13 A. No. I was never counseled about being
14 unavailable for work.
15 Q. Other than what you have described is your   14:55
16 working relationship with Mr. Dela Cruz, did you feel
17 like you had pretty good working relationships with
18 everyone else at PSC?
19 A. Yes, I did.
20 Q. Let's talk about your termination for a    14:55
21 little bit.
22 A. Okay.
23 Q. Tell us what happened that resulted in your
24 termination.
25 A. Resulted in my termination, a barge -- I    14:55

Page 131

1  overloaded a barge and I did not report the accurate
2  gauge for the barge as far as the overloading. It was
3  not accurate.
4  Q. Why not?
5  A. Well, it was part of the -- most of the    14:55
6  motivation behind it not being an accurate reading is
7  the fact that I felt that -- I felt that I was going
8  to be terminated because I overloaded the barge in the
9  first place. So with the information that I reported,
10 I did inform them that I overloaded the barge. I did   14:56
11 give them a rough estimate on the draft marks. Now,
12 there is -- on the barge there's three different
13 corners that you use as draft positions.
14 Q. Let me make sure I understand. By draft
15 marks, the customer of PSC said we want the barge    14:56
16 drafting to a certain height. Right?
17 A. Yes.
18 Q. As a tankerman, you're responsible for
19 following those orders and getting the cargo loaded to
20 those draft points. Correct?    14:57
21 A. Yes.
22 Q. On this particular occasion you agree you
23 didn't load it to those draft points?
24 A. I agree.
25 Q. Did you report it accurately?    14:57

Page 132

1  A. I did not report it accurately.
2  Q. Why not?
3  A. Because I felt like I was in a position where
4  I was about to get fired. That was the first time I
5  had ever made a mistake like that on loading. But    14:57
6  knowing the position that I was in, I was hoping that
7  it wouldn't have caused my termination.
8  Q. Okay. But you agree that is what caused your
9  termination?
10 A. Leading up to it. Well, no, it did not have   14:57
11 to be a reason why I was terminated. Because in this
12 business, that is not unusual to unload a barge -- I
13 mean to overload one. That happens all the time.
14 It's up to the discretion of the supervisor to either
15 allow you to fix it or make it good with the customer   14:58
16 or pick a disciplinary action.
17 Q. Who was this customer?
18 A. I want to say it was ACBL in Texas City.
19 Q. Do you know if ACBL complained about it?
20 A. I believe they did.    14:58
21 Q. Do you know if they sent the barge away from
22 the dock with it loaded improperly?
23 A. I believe -- the circumstances behind that, I
24 believe they left the barge in location and pumped it
25 off, but I was told that it moved.    14:58

Page 133

```
 1    Q.   Who told you that?
 2    A.   I was told that by Mason that they left.
 3    Q.   What could happen -- I mean, what are the
 4  possible consequences if you overload a barge?
 5    A.   If you overload the barge?                    14:59
 6         MS. TACKETT:  Objection, form.
 7    Q.   Can you answer or not?
 8         MS. TACKETT:  You can answer the
 9  question.
10    A.   Could you repeat the question?                14:59
11    Q.   Yes.  What are the possible consequences if
12  you overload a barge in the manner that you said you
13  did and it leaves the dock?
14         MS. TACKETT:  Same objection.  But you
15  can still answer the question.                       14:59
16    A.   What could happen if it leaves the dock?  It
17  would have to -- it could possibly not meet the draft
18  restrictions as it sails away wherever they are going,
19  depending on -- if they are going up north somewhere,
20  there are certain draft restrictions.  So if it's    14:59
21  loaded too heavy, then it would scrap the river floor,
22  whatever.  So it has to be -- it's very important that
23  it's loaded to draft.
24         (McKenzie Exhibit 12 marked.)
25    Q.   Let me hand to you and your attorney a        15:00
```

Page 134

```
 1  document that I've marked as Exhibit 12.  Have you
 2  seen this document before?  It's called a Quality
 3  Report.
 4    A.   No.
 5    Q.   This is the report prepared by Petroleum      15:00
 6  Service Corporation about the incident and it gives a
 7  date up there at the top.  I want to ask you some
 8  questions about it.  It indicates it was completed by
 9  Mason Dela Cruz.  Do you see that?
10    A.   Uh-huh.                                       15:00
11    Q.   It's dated February 22, 2007.  Actually, it
12  says that's the incident date.  Is that about the time
13  this happened?
14    A.   Yes.
15    Q.   And it lists you as the person responsible    15:01
16  and the product is styrene.  Do you remember it being
17  styrene?
18    A.   Yes.
19    Q.   Is styrene, is that a liquid?
20    A.   It's a dangerous liquid.                      15:01
21    Q.   The vessel name, it says CHEM 1300, I think.
22  And then the customer name is American Commercial
23  Barge Line and you used the initials ACBL.
24    A.   Yes.
25    Q.   Now, under description it says -- I want to   15:01
```

Page 135

```
 1  read through this and you tell me what you agree with
 2  and what you disagree with.
 3         It says, "At 10:49, while turning in times,
 4  Tankerman Arthur McKenzie reported that he had a 9" --
 5  is that 9-foot draft?                                15:01
 6    A.   Yes.
 7    Q.   "9-foot draft on his bow and starboard stern,
 8  but a 9-foot-6-inch on the port stern."  Is that what
 9  you reported?
10    A.   I believe so.                                 15:01
11    Q.   "The requested draft was 9 feet."  Was that
12  true?  Did ACBL --
13    A.   I believe the draft was 9 feet.
14    Q.   That would have been for all three of the
15  points it should have been at 9 feet?                15:02
16    A.   All four points should have been.
17    Q.   All four points?
18    A.   Yes.
19    Q.   That would be -- by the four points you're
20  talking about, the starboard bow and stern and the   15:02
21  port bow and stern?
22    A.   Yes.
23    Q.   The next paragraph, it says, "Immediate
24  Response.  Mason Dela Cruz was notified at 10:57.
25  Mason told TM."  I assume that means tankerman,      15:02
```

Page 136

```
 1  "McKenzie to see if the facility would allow barge to
 2  discharge to a 9-foot draft.  During this time
 3  Sterling" -- do you know who Sterling is?
 4    A.   Yes, sir, I do.
 5    Q.   Who is that?                                  15:02
 6    A.   Sterling is the refinery in Texas City.
 7    Q.   That's the name of the company?
 8    A.   No.  That's the name of the -- yes, the
 9  refinery.  Yes.
10    Q.   It's Sterling's product, they are making the  15:03
11  styrene?
12    A.   Yes.  They make styrene there, yes.
13    Q.   Who is Petroleum Service Corporation's
14  client?  Is it Sterling or is it American Commercial
15  Barge Line?                                          15:03
16    A.   I believe it's -- American, ACBL, I believe
17  has the contract or is the main supplier of
18  transportation.  PSC subcontracts that out, I guess.
19  I guess that's how it works.
20    Q.   Do you know if Sterling hired PSC to load the 15:03
21  barge or whether ACBL hired PSC to load the barge?
22    A.   I'm not sure how that works.
23    Q.   Okay.  "Sterling stated that the barge had
24  already sailed at 11:57."  Do you contend that is
25  incorrect?                                           15:04
```

Page 137

1  A.  I can't confirm that because I wasn't there
2  when it supposedly sailed.
3  Q.  Then it says, "Meredith Vasquez with ACL was
4  notified and okayed the barge to sail as is." Do you
5  know Meredith Vasquez?                                    15:04
6  A.  No, I do not.
7  Q.  Do know who would have notified her that the
8  barge is ready to go?
9  A.  I would imagine somebody from ACBL would have
10 to make a phone call to whoever.                          15:04
11 Q.  What does the tankerman do when he's finished
12 loading the barge?
13 A.  We call in our times. Once we're complete,
14 we just call in our times and we leave the plant.
15 Q.  Then it says, "At approximately 1320 Meredith 15:04
16 informed Mason that the lease boat reported an actual
17 draft of" -- I think that's -- is that 10 feet? Or
18 is that 10-feet-9-inches? Can you read on yours?
19 A.  I'm sorry. It says 10-9.
20 Q.  "10-feet-9-inches. She also said that the   15:05
21 barge was fogged in at the dock. Mason responded to
22 Sterling and verified that the actual drafts were bow
23 port 9-feet-0-inches, bow starboard 8-feet-0-inches,
24 stern port 10-feet-9-inches, the stern starboard
25 10-feet-0-inches." Do you know whether or not that's 15:05

Page 138

1  accurate, whether those are the actual drafts?
2  A.  I can say with the actual draft, after
3  loading, depending on how the product shifts, it will
4  change. If the barge isn't level, it will -- at some
5  point the draft will change, but I do know I did      15:05
6  overload the barge.
7  Q.  Do you know what the drafts were that you put
8  in?
9  A.  I believe it was -- it's like it said here.
10 I reported it -- they requested a 9-foot draft. When  15:06
11 I called in my times, I did report it 9-6. Now
12 whether it was port or stern, that part, I don't
13 remember. And at that point with dispatch -- they
14 asked me, "Are you aware that you overloaded the
15 barge?" I said, "I did." And I called in my times.   15:06
16 And that was -- whatever the information do you need.
17 Q.  Do you know what the drafts were when you
18 completed the work and called in your times, or are
19 you not sure?
20 A.  I'm not really sure. But I know it was 9-6   15:06
21 and maybe a 10-foot at one particular point, but I'm
22 not sure exactly. But I do know this, that the
23 barge -- if you log in your draft mark or request
24 them -- and you step off that barge, as that barge
25 kind of sits there, if it's uneven, it's going to    15:07

Page 139

1  start to list to one particular side. So as I
2  overloaded the barge, which I know I did, I know it
3  changed after I left.
4  Q.  The barge could be uneven because you
5  overloaded?                                               15:07
6  A.  Yeah. I'm not disputing that.
7  Q.  Okay. Now, let's go down to the
8  Investigation Findings. Do you see that?
9  A.  Yes, I do.
10 Q.  It says, "A root cause investigation was held 15:07
11 at SGS Petroleum Services Pasadena office on
12 February 23rd. In attendance were Jimmy Horn, Robert
13 Neuman, Robert Franks, Mason Dela Cruz and Arthur
14 McKenzie." Do you remember that meeting?
15 A.  Yes, I do.                                         15:08
16 Q.  Tell us what you remember about that meeting.
17 A.  What I remember about that meeting was two
18 things. They asked me did I understand what I did as
19 far as overloading a barge. We went over what was
20 requested and what was the actual draft. I also -- in 15:08
21 that meeting Dela Cruz, Jimmy Horn was asking me
22 pretty much the questions. Before this meeting when
23 they called me into the office, he was going to give
24 me a three-day suspension. They gave me a meeting,
25 coming from Sterling.                                     15:08

Page 140

1       After I left Sterling, Texas City, I went to
2  the office, because he asked me to come in.
3  Q.  Who?
4  A.  Mason.
5  Q.  Okay.                                              15:08
6  A.  I went into the office. He explained to me
7  that he had talked to Jimmy Horn. And that they had
8  decided that after listening to me explain what had
9  happened, that they were going to give me a three-day
10 suspension.                                              15:09
11 Q.  Tell me what you explained happened.
12 A.  I explained to them that I overloaded the
13 barge.
14 Q.  When did you first tell Mason that?
15 A.  It was shortly after the incident. It had to  15:09
16 be after I turned in my time, because I had to drive
17 from Texas City back to the Houston office.
18 Q.  Did you tell him that because he had already
19 gotten a complaint from the customer that it was
20 overloaded?                                              15:09
21 A.  I'm not sure. No. Yeah, I believe he did a
22 call because he called me. And actually he said he
23 wanted me to go back. Halfway to Houston, he wanted
24 me go back to Texas City because they were going to
25 pump the barge off. But then he called me as soon as 15:10

Page 141

1  I get to Texas City and told me that the barge had
2  already sailed. On the way back, I didn't discover
3  that the barge didn't sail immediately. That actually
4  I could have fixed it, but that came after the root
5  cause. I was told by Mason that I couldn't fix the          15:10
6  overloading, verbally, because the barge had left.
7      And so when I got -- by the time I got back
8  to the office, he had already talked to the customer
9  by then. He had indicated to me that there was
10 already a disciplinary conversation that had took           15:10
11 place and that they were going to suspend me.
12     This was -- then I got a call I want to say
13 the same day or the next day. He told me that he was
14 going to take me out of rotation until they get to the
15 root of the scenario. And in turn he told me to            15:11
16 report to the next -- they had a safety meeting.
17 Another group had a safety meeting on a Friday and
18 that I was to come to that safety meeting.
19     And at the safety meeting, that's when they
20 had the termination meeting, the root cause meeting.       15:11
21 I'm sorry. He wanted me to come to the root cause
22 meeting on --
23 Q.  February 23?
24 A.  Yeah, I want to say it's the 23rd. I don't
25 remember what day it was exactly. Now, at that             15:11

Page 142

1  meeting, that's when they were indicating to me that
2  do I understand that overloading the barge was wrong,
3  this and that. Did you say a 9-6? Which I say I did.
4  Did you know that the barge actually was this? And I
5  said, Well, yes. Then they were asking me different        15:11
6  questions about the discrepancy between the barges
7  being loaded.
8      At that meeting Jimmy Horn had to step in
9  because Mason was making little comments and felt that
10 some of my answers, he would laugh at. As I'm talking     15:12
11 to Jimmy, Mason would laugh at some of the things I
12 was saying.
13 Q.  Like what?
14 A.  He was making little -- he was smirking and
15 laughing like -- he would say, "Well, what did you        15:12
16 report that the barge was?" I would say, "9-6." They
17 said, "Well, we checked." Somebody else would say --
18 Jimmy Horn might say, "Well, the customer said it was
19 at 10-something." While he's saying that, Mason is
20 like smirking and making little noises. Where I had       15:12
21 to ask Mason what did he think was funny, because this
22 is my life that we're talking about. And Jimmy Horn
23 had to ask Mason to step away from that meeting for a
24 second because we were starting to bump heads a little
25 bit.                                                       15:13

Page 143

1      And the point being is I just felt like even
2  then my career and my being up under his direction was
3  all -- he was just looking for a reason to get rid of
4  me. Because again even with this, there was not -- I
5  do understand the termination part of it, if you want     15:13
6  to do that, but it did not have to be held that way.
7  Again, that's one of those things that I think I was
8  always just singled out.
9  Q.  What do you mean when you say you do
10 understand the termination part of it?                    15:13
11 A.  I do understand that they have a right to
12 terminate me for overloading the barge, because that
13 happens in this industry all the time.
14 Q.  Okay. Who do you know -- well, when we
15 started on this discussion you said something about       15:13
16 your motivation for saying what you said was because
17 you were afraid of being terminated. Do you remember
18 saying that?
19 A.  Yes.
20 Q.  What were you talking about? Your motivation   15:14
21 for doing what?
22 A.  My motivation for not reporting it
23 accurately -- the drafts accurately was because of my
24 fear of knowing that I could possibly be terminated.
25 Q.  Are you talking about the first time you              15:14

Page 144

1  reported it when you called in your time or are you
2  talking about after?
3  A.  I'm talking about the first time I reported
4  my time.
5  Q.  Like up at the top where it says you reported   15:14
6  that there was a 9-foot draft on the bow and starboard
7  stern, but a 9-6-inch on the port stern?
8  A.  Yes.
9  Q.  You know that was inaccurate?
10 A.  Well, I know one of them was a 9-6. There      15:14
11 was a -- then another corner was a 10-0.
12 Q.  You knew that?
13 A.  I knew that, but I didn't report it
14 accurately. I understand that.
15 Q.  Why couldn't you have fixed it then?           15:15
16 A.  They wouldn't let me fix it.
17 Q.  Who?
18 A.  Mason. He made the decision not to allow me
19 to fix the problem.
20 Q.  Let me make sure you understand the question.  15:15
21 I apologize. I cut you off. I'm going to let you
22 finish. But Mason wasn't even involved when you first
23 called your time in and reported the drafts, was he?
24 A.  Well, he's involved maybe -- and I don't know
25 the process. I called dispatch. And I guess              15:15

Page 145

1  dispatch -- if there is a discrepancy in the field,
2  then the dispatch notifies the supervisor and I guess
3  at that point the supervisor contacts the tankerman.
4      Q.   Right.  But when you called your time in --
5      A.   Through dispatch.                              15:16
6      Q.   -- through dispatch and reported the
7  drafts --
8      A.   Uh-huh.
9      Q.   -- you reported them inaccurately that time.
10     A.   Right.                                         15:16
11     Q.   Correct?
12     A.   Yes.
13     Q.   And Mason wasn't involved at that time yet,
14  was he?
15     A.   Well, what I said was once I entered the time  15:16
16  inaccurately, I was hoping that it wouldn't come back.
17  I was hoping that the customer wasn't going to say
18  that it was a problem and just kind of let it sail.
19  So that was my -- that was my thinking process.
20  Because I was -- again, I felt that -- that was the    15:16
21  first time I had ever overloaded a barge.  And like I
22  said, it happens all the time.  But I felt that this
23  was going to be the thing that got me terminated.
24     Q.   It was.  Right?
25     A.   Yes, it was.  Yes and no.                      15:17

Page 146

1      Q.   Now, what do you mean by "yes" and "no"?
2      A.   Again, that's an option that a supervisor
3  could use.  So I felt that any mistake I made was
4  grounds for termination versus a verbal reprimand.  My
5  first time ever having an issue was a three-day        15:17
6  suspension so my punishment has always been harsh.
7      Q.   You agree that you did something wrong?
8      A.   Oh, there is no doubt.  I agree.
9      Q.   You should have been disciplined.  It's just
10  a question of the severity of the discipline.         15:17
11     A.   It depends on what the company constitutes as
12  discipline.  Some of it is just verbal.  Supervisor
13  could say, "Hey, turn back around.  Go pump that off."
14  No harm, no foul.
15     Q.   Let me back up to one thing that I'm still    15:17
16  confused about.  If you'll look at the description in
17  this document, Exhibit 12, what I'm not clear about,
18  you said Mason wouldn't let you correct the overdraft.
19     A.   Right.
20     Q.   Now, my question is:  When you knew -- when   15:18
21  you called in your time and reported the drafts, you
22  knew at that point you were reporting the wrong
23  drafts.  Correct?
24     A.   Yes.
25     Q.   Rather than calling your time then and report 15:18

Page 147

1  the wrong drafts, why didn't you fix the drafts then
2  before you called your time in?
3      A.   Well, you cannot fix the draft.  It was a
4  load.  There is a lot goes into -- once we do a
5  shutdown, that means the job is complete, they would   15:18
6  have to get an inspection company to do a lot of work
7  and gauge different tanks because it's a gauging deal.
8  So you're loading from a shore tank to a barge.  You
9  can't just very well crank the engines up and pump
10  that same product back to a shore tank.  There is more 15:19
11  that goes into it.  You have to bring an inspection
12  team out.  There is a lot of paperwork involved.  You
13  have to probably get another invoice, I would imagine.
14  It's a billing situation.  So it's not something that
15  you can fix.                                           15:19
16     Q.   I understand and appreciate your honesty.  As
17  I understand it then, you knew you overdrafted and so
18  you're thinking rather than -- and you know it's going
19  to require a lot of extra work to fix it.
20     A.   Right.                                        15:19
21     Q.   So you're hoping if you just report it
22  incorrectly, then the client will not even worry about
23  it and it won't be a problem?
24     A.   Basically, yes.
25     Q.   I got it.                                     15:19

Page 148

1      A.   That was my mentality.
2      Q.   Okay.
3      A.   That was my thinking process.
4      Q.   Do you know -- going back to the meeting
5  itself with Mr. Dela Cruz, and you said Mr. Horn asked  15:19
6  him to step out of the meeting for a while because he
7  was -- apparently you and Mr. Dela Cruz were having
8  words at that point.
9      A.   Uh-huh.
10     Q.   Did he ever come back into the meeting or did 15:20
11  Mr. Horn keep him out the rest of the time?
12     A.   He came back into the meeting.
13     Q.   How long was he out?
14     A.   He was out for maybe ten or 15 minutes.
15     Q.   Do you know who made the decision to          15:20
16  terminate your employment?
17     A.   No, I do not.  I would imagine it would be
18  Jimmy Horn's decision to make.  If it was up to Mason,
19  I already know where that was going.
20          (McKenzie Exhibit No. 13 marked.)             15:20
21     Q.   Let me hand to you and your attorney a
22  document which I marked as Exhibit 13, which is called
23  Termination Record.  Have you ever seen this before?
24     A.   No.
25     Q.   Down at the bottom it says, "Give a detailed  15:20