## Page 149

1  explanation and attach supporting documentation." It
2  says, "On February 22, Arthur was loading an ACL barge
3  at Sterling, Texas City. He called in his time and
4  dispatch noticed that he overdrafted the barge by 6
5  inches." That would be consistent with the prior                15:21
6  statement where you said you actually reported a 9.6,
7  or 9-foot-6-inch draft?
8     A.   Yes.
9     Q.   I don't know if we call it a purchase order,
10 but I'll use that term. The purchase order said that   15:21
11 Sterling wanted 9-foot drafts at each point. Correct?
12    A.   Yes.
13    Q.   Then it says, "Dispatch questioned him and he
14 admitted to overdrafting the barge." And you agree
15 with that?                                             15:21
16    A.   Yes.
17    Q.   "Mason asked Arthur to report to the office
18 to discuss the importance in reporting an overdraft."
19 Is that true?
20    A.   No.                                            15:22
21    Q.   That's not true?
22    A.   No.
23    Q.   Mason didn't ask you to report to the office?
24    A.   He asked me to report the office because
25 there was a problem.                                   15:22

## Page 150

1     Q.   Okay.
2     A.   But it wasn't about the importance of
3  reporting an overdraft because I did that.
4     Q.   Then it says, "A few hours later ACL called
5  and reported that Arthur had overdrafted the barge by  15:22
6  1-foot-9-inches." Do you know whether or not that is
7  what ACL reported?
8     A.   That is a possibility because, again, styrene
9  is a very heavy product. If you overload it -- I can
10 look at the overdraft now. But a few hours from now    15:22
11 or shortly afterwards, the barge is going to continue
12 to sink because it's listing, meaning like it's
13 overloaded. We're talking about maybe 30,000 gallons
14 of styrene. Styrene, like I said, is a heavy product.
15 Now I'm not saying that the reported gauges are not    15:23
16 accurate after the fact. But as I reported it, I know
17 I was not off as much as they were saying that I'm
18 off, but I'm willing to accept that as their final
19 draft mark knowing the situation. I accept
20 responsibility for that.                               15:23
21    Q.   As I understand, just to clarify, you're
22 putting this stuff in the bottom of the barge.
23 Correct?
24    A.   Uh-huh.
25    Q.   You have got this barge and it's divided into 15:23

## Page 151

1  compartments?
2     A.   Yes, it is.
3     Q.   So you're putting it -- each compartment you
4  have got your port side bow, your port side stern, and
5  starboard stern and bow and each one is a separate     15:23
6  compartment so you fill the product -- you fill each
7  compartment up to a certain level. And that's
8  important to make the barge flow or as it travels
9  through the water, steady?
10    A.   Yes.                                           15:24
11    Q.   All right. Then going back to Exhibit 13.
12 The next sentence says, "Arthur was asked to come in
13 on 2/23 for a root cause investigation." You agree
14 with that. Correct?
15    A.   Yes.                                           15:24
16    Q.   "During the investigation, Arthur admitted
17 that he had overdrafted the barge by 1-foot-9-inches."
18 As I understand your testimony, you agree that you
19 overdrafted it, but not necessarily by that much?
20    A.   Yes.                                           15:24
21    Q.   And was hoping that he would not get caught.
22 That's true. Right?
23    A.   Yes.
24    Q.   "Due to Arthur's actions he is being
25 terminated for violating the Integrity and Ethics      15:24

## Page 152

1  policy." When did they tell you that you were being
2  terminated?
3     A.   They told me right after the root cause
4  meeting.
5     Q.   Who told you that?                            15:25
6     A.   They called me into Jimmy Horn's office and
7  that's when they indicated to me.
8     Q.   Who talked to you?
9     A.   I believe it was Mason.
10    Q.   And what did he tell you?                     15:25
11    A.   He just told me that, "The determination for
12 the root cause investigation, we decided to terminate
13 your employment."
14         (McKenzie Exhibit No. 14 marked.)
15    Q.   Let me hand to you and your attorney a        15:25
16 document marked as Exhibit 14. This is a page out of
17 the Tankerman Ops manual. Did you have a tankerman
18 Ops manual?
19    A.   Is this one page off of that manual?
20    Q.   Yes.                                          15:25
21    A.   Do you have a copy of the manual that I
22 can have a visual?
23    Q.   I don't.
24    A.   Because I can't answer that.
25    Q.   You don't remember this. Well, this says, in  15:26

## Page 153

1  the lower right-hand corner, page 77.
2  A.  Okay.
3  Q.  Under the section that -- you see the section
4  at the bottom labeled Draft Loading?
5  A.  Yes.                                                    15:26
6  Q.  It says, "If any problems are encountered
7  that will prevent a vessel from being loaded to the
8  requested draft or for any reason the final drafts are
9  not attained as requested, PSC's policy requires
10 tankermen to notify PSC dispatch before proceeding          15:26
11 with the disconnection of the dock arm/hose." Were
12 you aware of that?
13 A.  No, I was not.
14      (McKenzie Exhibit No. 15 marked.)
15 Q.  Let me hand to you and your attorney a           15:26
16 document I have marked as Exhibit 15.  Is this part of
17 an examination you took during the TCA?
18 A.  Yes, it is.
19 Q.  Do you remember taking this exam?
20 A.  We took many.  But yes, I believe so.           15:26
21 Q.  This indicates -- is it your handwriting up
22 at the top?
23 A.  Yes, it is.
24 Q.  Do you know who signed it as evaluator?
25 A.  It would have to be one of my -- Archie          15:27

## Page 154

1  Knighton.  That's what it looks like.
2  Q.  Okay.
3  A.  That's Archie Knighton.
4  Q.  Question 2, the question is, "Other
5  considerations of a tankerman's transfer plan are:  A.   15:27
6  Loading to draft.  B.  Shore stop.  C.  Deck loading.
7  And the D.  All the above." You answered that, "All
8  of above." Correct?
9  A.  Yes.
10 Q.  That was the right answer?                      15:27
11 A.  Yes.
12 Q.  So it is the tankerman's responsibility to
13 load to draft?
14 A.  Yes, it is.
15 Q.  And question 3, you agree that it's the         15:28
16 tankerman's responsibility to load to the requested
17 cargo level?
18 A.  Yes, I do.
19 Q.  That's your signature on the second page?
20 A.  Yes, it is.                                     15:28
21 Q.  Do you remember having an exit interview with
22 Christina?
23 A.  Yes, I do.
24      (McKenzie Exhibit No. 16 marked.)
25 Q.  Let me hand to you and your attorney a          15:28

## Page 155

1  document that I marked as Exhibit 16.  Okay.  The
2  first page I believe was filled out.  Tell me what you
3  remember talking to Christina about.
4  A.  You're asking me?  What's the question?
5  Q.  Well, this indicates that there was an exit     15:29
6  interview done on February 26th, 2007.
7  A.  Uh-huh.
8  Q.  And as I understand, page 1 of Exhibit 16 is
9  the front side completed by Christina and page 2 you
10 filled out.  Is that correct?                        15:29
11 A.  Yes, I filled out page 2.
12 Q.  You signed it down there at the bottom?
13 A.  Yes, I did.
14 Q.  How did this exit interview come about?
15 A.  After I was terminated or notified that I was    15:29
16 terminated, I was to do an exit interview with
17 Christina.  Made provisions to bring my tools back and
18 go over this document, I suppose.
19 Q.  Did you see this document, the front page?
20 A.  Yes, I think I did.                              15:29
21 Q.  How long did the meeting last?
22 A.  It didn't last long.  I would say five
23 minutes at the most, if that long.
24 Q.  Did Christina tell you where it says Further
25 Explanation, written there, "Violated company         15:30

## Page 156

1  integrity.  Intentionally did not report overdrafting
2  a barge by 1-foot-9-inches"?  Did she tell you that?
3  A.  No, she did not.
4  Q.  Now, under Comments on Work Performance it
5  says, "Had problems with Arthur in the beginning but    15:30
6  he was counseled and his performance improved.
7  Terminated due to violation of Integrity policy." Did
8  anyone ever tell you that?
9  A.  No.  I never knew that they had problems with
10 me at the beginning.                                  15:30
11 Q.  You knew about the --
12 A.  I didn't know that they knew.
13 Q.  You did get suspended because of the fire
14 extinguisher.  Right?
15 A.  Yes.                                              15:31
16 Q.  That happened -- I think you said that
17 happened between the time you graduated from the TCA
18 in March of '05 and the time you went on leave of
19 absence in June of '05 for the car accident.
20 A.  Yes, it was shortly after.                        15:31
21 Q.  Let's look at the second page for a minute.
22 And you did fill this one out.  Correct?
23 A.  Partially, yes.
24 Q.  What part did you not fill out?
25 A.  I guess everything that is not checked off.       15:31

Pages 153 to 156

Page 157

```
1    Q.   Did you check off -- did you check off that
2　you were very satisfied with the nature of the job?
3    A.   Yes.
4    Q.   Did you check off that you were very
5 satisfied with the use of skills and experiences?        15:31
6    A.   Yes.
7    Q.   Did you check off that you were satisfied
8 with the performance evaluations?
9    A.   Yes.
10   Q.   Did you check off that you were very          15:32
11 satisfied with training programs?
12   A.   Yes, I did.
13   Q.   Did you check off that you were very
14 dissatisfied with advancement opportunities?
15   A.   Yes, I did.                                   15:32
16   Q.   Were you sincere about these check-offs when
17 you checked these off?
18   A.   Depending on the category, yes.
19   Q.   What do you mean "depending on the category"?
20   A.   I was sincere about the lack of advancement  15:32
21 for opportunities. I was very dissatisfied with that.
22   Q.   Were you sincere when you checked off that
23 you were either very satisfied or satisfied with the
24 other four categories?
25   A.   Yes, I was sincere.                           15:32
```

Page 158

```
1    Q.   Were you sincere when you checked off that
2 you were very satisfied with salary and benefits?
3    A.   Yes.
4    Q.   Were you sincere when you checked off that
5 you were satisfied with supervision?                   15:32
6    A.   To the extent, yes, yes.
7    Q.   To what extent were you not? Just Mason?
8    A.   Yes, exactly.
9    Q.   Were you sincere when you checked off that
10 you were very satisfied with working conditions and   15:33
11 overall as a place to work?
12   A.   Yes, I was very satisfied.
13   Q.   Now, under that there is a question, some of
14 it is cut off. I apologize for the bad copy here. It
15 says, "Relationship to supervisor." It says, "Okay." 15:33
16 Did you write that in there?
17   A.   Yes, I did.
18   Q.   Were you sincere about that?
19   A.   Yes, I was.
20   Q.   That you had an okay relationship with Mason? 15:33
21   A.   I put that my relationship was okay at the
22 time.
23   Q.   Then you checked off that you did take some
24 complaints to your supervisor?
25   A.   Yes, I did.                                    15:33
```

Page 159

```
1    Q.   What were those complaints?
2    A.   My complaints were that lack of advancement
3 or opportunity and also me getting my endorsement
4 LG-wise.
5    Q.   During this exit interview -- you understood 15:33
6 that Christina was part of human resources department,
7 didn't you?
8    A.   Yes. She was Houston's human resources
9 individual.
10   Q.   Did you inform her that you felt you were   15:34
11 discriminated against during your employment?
12   A.   No, I did not inform her.
13   Q.   Why not?
14   A.   Well, I never felt like Christina could do
15 anything about anything anyway so I took my complaints 15:34
16 to my immediate supervisor. And that was the route
17 that I went.
18        (McKenzie Exhibit No. 17 marked.)
19   Q.   Let me hand to you and your attorney a
20 document that I have marked as Exhibit 17. This is a  15:34
21 letter dated April 20, 2007, from Marsha Ramsey. Do
22 you remember receiving this letter?
23   A.   Yes, I do remember.
24   Q.   Do you know what prompted this letter? Did
25 you call Ms. Ramsey?                                   15:34
```

Page 160

```
1    A.   I'm not really sure what prompted the
2 conversation or whether I got this letter first and
3 responded afterwards or I called.
4    Q.   It says in the first paragraph -- it says,
5 "This is a follow-up to our prior correspondence and  15:35
6 telephone conversation concerning your dissatisfaction
7 with the Tankerman Career Academy." So I'm
8 wondering -- that leads me to believe that you either
9 wrote to Ms. Ramsey or called her on the -- well, on
10 the telephone both and said you were dissatisfied with 15:35
11 the TCA.
12   A.   I wanted -- I don't really recall how that
13 went. But I want to say that I was -- I was told to
14 call Marsha because there was communication between
15 myself and Christina on being eligible for rehire at  15:35
16 one particular time.
17   Q.   Okay.
18   A.   And that was based on my termination. I
19 think this was a consideration because PSC has
20 terminated people before and had hired them back,     15:36
21 based on disciplinary situation. So upon me leaving
22 Christina's office, my question to her was, "Am I
23 eligible for rehire?" And she could not answer that.
24   Q.   Let me ask you a question going back to your
25 termination. You made a comment that barges are often 15:36
```

Page 161

1 overdrafted.
2   A.  Yes.
3   Q.  Do you know of any other tankerman for PSC
4 that overdrafted a barge, reported the wrong drafts
5 and was not terminated?                                    15:36
6   A.  I know Alex. Alex Jackson indicated that he
7 overloaded the barge.
8   Q.  Which barge is that?
9   A.  I don't know. He's done it in his career.
10 Like I said, it happens more often than you think.        15:37
11 Some are recorded, some are not. It's up to the
12 supervisor and the facility. They can exercise the
13 right to handle it however they want. Not necessarily
14 are all of them done that way. Like I said, it's up
15 to the supervisor.                                         15:37
16  Q.  Is Mr. Jackson white or black?
17  A.  No. He's black.
18  Q.  Is he the only one that has ever told you or
19 that you have reason to believe overloaded a barge?
20  A.  I would say every tankerman at PSC has           15:37
21 overloaded a barge at some point in their career.
22 It's inevitable. It's going to happen.
23  Q.  Did Mr. Jackson indicate whether or not he
24 reported to dispatch the correct drafts or incorrect
25 drafts?                                                   15:38

Page 162

1   A.  That I'm not sure. For me overloading the
2 barge, I felt like prior to me even overloading the
3 barge, there was no room for error for me as a
4 tankerman. There never has been, despite all the
5 things that you hear in the field and things that I       15:38
6 know by some of the people that I have spoken with.
7 And all I can do is do my career under one particular
8 supervisor.
9   Q.  Let's go back to Exhibit 17. Who is your
10 current supervisor with your company now?                 15:38
11  A.  I guess Lorie. She's our crew manager.
12  Q.  You haven't had any problems with her?
13  A.  No, I haven't had any problems. I had
14 documentation that could back up me not having any
15 problems with the company I'm at now.                     15:39
16  Q.  What is Lorie's last name?
17  A.  I can't think of her last name right now. I
18 work under the direction of Bob Bouchard, which he's
19 the owner of the company.
20  Q.  You mentioned -- what documentation are you     15:39
21 talking about? You said had documentation evidencing
22 that you have had no problems with the company.
23  A.  That I'm with now?
24  Q.  Yes.
25  A.  Yes, I do.                                           15:39

Page 163

1   Q.  What is that?
2   A.  Letters of recommendation, evaluation.
3   Q.  Going back to Exhibit 17, in the third
4 paragraph it says, "I understand you are unhappy with
5 not getting the LG endorsement because you did not get    15:39
6 enough actual transfers." Do you remember telling
7 Ms. Ramsey that?
8   A.  I don't believe we spoke about that
9 specifically having enough transfers. That part of it
10 I don't recall.                                           15:40
11  Q.  Do you remember expressing to her that you
12 were unhappy about not getting your LG endorsement?
13  A.  Yes, I definitely remember that.
14  Q.  Why don't you take a minute and read over
15 this letter and tell us if there is anything in that      15:40
16 letter that Ms. Ramsey says that you disagree with or
17 think is incorrect.
18  A.  I don't agree with the last paragraph where
19 I'm being suggested to go to another place of
20 employment, who would give me the opportunity to          15:40
21 receive my LG endorsement because I was with the
22 company that could have done that for me. And even
23 though me not having an LG endorsement didn't
24 negatively impact me having a career as tankerman, it
25 did impact my earning potential. So those two --          15:41

Page 164

1 those two points are what I have a problem with.
2         (McKenzie Exhibits 18 and 19 marked.)
3   Q.  Let me hand to you and your attorney a
4 document that I have marked as Exhibit 18. I'll go
5 ahead and hand you Exhibit 19 as well. Exhibit 18 is      15:41
6 a copy of the Charge of Discrimination you filed with
7 the Equal Employment Opportunity Commission. Correct?
8   A.  Yes.
9   Q.  Now I want to ask you -- that's your
10 signature down at the bottom?                             15:42
11  A.  That is my signature at the bottom.
12  Q.  You dated it 9/7/07?
13  A.  Yes.
14  Q.  The notary is named McKenzie, too. Who is
15 that?                                                     15:42
16  A.  My wife is a notary.
17  Q.  She's a notary?
18  A.  Yes.
19  Q.  What does she do?
20  A.  She's a payroll consultant.                         15:42
21  Q.  Did you go down to the EEOC to fill this out
22 or did you send them some information and fill this
23 out and sign it at your home?
24  A.  No. Actually, I did my EEOC through my
25 attorney.                                                 15:42

Pages 161 to 164

## Page 165

1 Q. Okay. Now, I want to ask you a couple of
2 questions about here where it says the particulars.
3 Right where I'm pointing. A little bit past halfway
4 it says, "I graduated from Petroleum Service
5 Corporation Tankerman Academy in March 2006." That     15:42
6 should actually be 2005. Correct?
7 A. Yes.
8 Q. And then you say, "At that time I was denied
9 the LG endorsement because of my race." Correct?
10 A. Yes.     15:43
11 Q. Then it says, "In March 2006," that should
12 all be 2005. Right?
13 A. Where are you seeing that?
14 Q. The next sentence, it says, "In March 2006, I
15 became an employee."     15:43
16 A. Yes, yes.
17 Q. You had actually been an employee of PSC
18 since November of 2005. Correct?
19 A. Yes.
20 Q. You were just in the academy.     15:43
21     MS. TACKETT: November '04.
22 A. November '04.
23 Q. You're right. Thanks. You've got a sentence
24 in here, "Other white tankermen that graduated in my
25 class were assigned to different groups and received     15:44

## Page 166

1 their LG endorsement." Who are you talking about?
2 A. Mr. Robert --
3 Q. Franks?
4 A. Robert Franks.
5 Q. Okay. Didn't he have his endorsement when he     15:44
6 graduated?
7 A. He may have.
8 Q. Okay. You don't know.
9 A. I know he has his LG endorsement. I know he
10 used to do a lot of liquefied LG barge work in     15:44
11 Corpus -- Corpus Christi.
12 Q. Who else are you talking about? You say
13 other tankermen plural. Who else are you talking
14 about besides Mr. Franks?
15 A. I think Crockett -- Bruce Crockett has his     15:44
16 LG.
17 Q. Do you know if he got it upon graduation or
18 afterwards?
19 A. I'm not sure.
20 Q. Then you say, "Until my termination, I     15:44
21 continued to request the training required to become
22 eligible for the LG endorsement." What additional
23 training did you think you needed?
24 A. Whatever training that PSC was supposed to
25 provide for me to ensure that I get my LG.     15:45

## Page 167

1 Q. You say, "But my supervisor, Mason Dela Cruz,
2 and PSC denied my request." They didn't actually deny
3 your request. They just didn't do it. Is that right?
4 A. Through their actions.
5 Q. I understand.     15:45
6 A. Exactly.
7 Q. They didn't come out and say, "No, you're not
8 getting this"?
9 A. No, they did not say that.
10 Q. It says, "When I was terminated, Marsha     15:45
11 Ramsey in human resources offered me $1,000 to buy my
12 silence about PSC's failure to provide the LG
13 endorsement. I refused the money." What are you
14 talking about there?
15 A. I'm saying -- actually, it was Christina.     15:45
16 And I guess she would get the dollar amount from maybe
17 even Marsha. I'm not sure. But it was offered to me
18 and as a settlement for my lack of having the LG and
19 that was supposed to supposedly cover reimbursement
20 for my tuition, is what I was told. So that's what I     15:46
21 mean. And I refused to accept $1,000.
22 Q. It says, "To buy my silence." Someone told
23 you that you couldn't talk about it?
24 A. Well, what I mean by that actually is if I
25 was to accept the $1,000, then I would be silencing my     15:46

## Page 168

1 complaint.
2 Q. That was an assumption of yours. No one told
3 you --
4 A. No. No one told me that.
5 Q. Why do you say that was a condition -- that     15:46
6 settlement -- that was a settlement offer?
7 A. Well, because, again, that's to compensate
8 for supposedly reimbursement of tuition for me not
9 getting my liquefied gas endorsement.
10 Q. Did Christina or Ms. Ramsey or anyone else     15:47
11 tell you that that would be a settlement?
12 A. Well, that's what it's for.
13 Q. How do you know that?
14 A. Well, Christina told me that's what it's for.
15 Q. Exhibit 19, is this the affidavit you     15:47
16 provided to the EEOC?
17 A. What is it?
18 Q. Exhibit 19.
19 A. Yes.
20 Q. Do you remember filling out any other     15:47
21 paperwork that was submitted to the EEOC besides
22 Exhibits 18 and 19?
23 A. No.
24     (McKenzie Exhibit No. 20 marked.)
25 Q. I'm going to hand to you and your attorney an     15:48

Page 169

1 exhibit marked as Exhibit 20.  Do you remember
2 receiving this Dismissal and Notice of Right to Sue
3 from the EEOC?
4     A.  Yes.
5     Q.  Was it your understanding that the EEOC did        15:48
6 not find that you had been discriminated against?
7     A.  I read that sentence and I assumed that's
8 what it is meaning, yes.
9     Q.  Did you ever talk to anyone at the EEOC about
10 your allegations?                                         15:48
11    A.  No, I did not.
12               (McKenzie Exhibit No. 21 marked.)
13    Q.  I'm going to hand to you and your attorney a
14 document I marked as Exhibit 21, which is the
15 Employment Application you filled out with Crowley.       15:49
16    A.  I believe it is.
17    Q.  Is all the handwritten material on here
18 yours?
19    A.  Yes, it is.
20    Q.  On the third page -- well, on the fourth           15:49
21 page, that is your signature down at the bottom?
22    A.  On the fourth page, yes, it is.
23    Q.  That's dated June 7, 2007?
24    A.  Yes.
25    Q.  Is that about the time you went to work for       15:49

Page 170

1 Crowley?
2     A.  Yes.  That's about right, June of '07.
3     Q.  Did you say you earned more from Crowley
4 during the few months you worked for them than you
5 were earning when your employment with PSC ended?          15:49
6     A.  Yes, I was making more.  Now, I will say
7 this.  When you're working with Crowley and Bouchard,
8 even though you're a tankerman, pay scale is always
9 going to be different.  I'm on ship versus shoreside.
10 Shoreside tankerman don't make as much as someone who     15:50
11 works on a ship.  So any time you're away from home,
12 they make provisions for that and most people that
13 work offshore get paid a daily rate.
14    Q.  On the third page of Exhibit 21, it's got --
15 you list SGS there.  And under reason for leaving or      15:50
16 considering leaving, it says, "On call and
17 scheduling."  What does that mean?
18    A.  Actually, I put that down on my application
19 because that is one -- that's a reason -- that's
20 another reason.  I didn't like the schedule.  But I       15:50
21 did like what the next part of it.  It says, "May we
22 contact."  I had no problem with them contacting PSC
23 to even get into whatever they wanted to discuss.
24    Q.  Then under your ending rate of pay you listed
25 $24 per hour.  Is that right?                             15:51

Page 171

1     A.  Yeah.  That was -- I did that based on kind
2 of like an average of me doing -- load barges,
3 sometimes I would get a little bit of overtime.  So
4 that's where I came up with that figure.
5               (McKenzie Exhibit No. 22 marked.)          15:51
6     Q.  We're almost done.  Let me hand to you and
7 your attorney a document I'm marking as Exhibit 22,
8 which are actually discovery responses that were
9 prepared by your attorney in this case.  I just want
10 to ask you a couple of questions about a couple of       15:52
11 answers.  On page 2 it asks about doctors that you've
12 seen from January 1, 2004 to the present.  And your
13 attorney has made some objections, but the only doctor
14 listed is Dr. Paul Marullo.  Is that the doctor that
15 you were seeing for the car accident?                    15:52
16    A.  Yes.
17    Q.  Have you seen any doctors for anything that
18 you attribute to Petroleum Service Corporation?
19    A.  No.
20    Q.  If you'll look at page 4.  In response to        15:52
21 Interrogatory No. 5, you've got as your earnings per
22 Crowley 385 per day.  Is that accurate?
23    A.  Yeah, that's about right.
24    Q.  You worked there from about June to August of
25 2007?                                                    15:53

Page 172

1     A.  Yes.  The actual dollar amount, I would
2 probably have to get back with you on that.  I need to
3 double-check that, because that changed, too, while I
4 was there.
5     Q.  311 a day for Bouchard, is that accurate?        15:53
6     A.  That's accurate.
7     Q.  Then on the next page in response to
8 Interrogatory No. 7 you had also applied for Florida
9 Marine Transporters?
10    A.  Yes.                                             15:53
11    Q.  Did they tell you why they were not hiring
12 you?
13    A.  I accepted a position at Bouchard.
14    Q.  Okay.  Did Florida Marine offer you a job
15 also?                                                    15:54
16    A.  Yes, they did.
17    Q.  What about Moran Towing?
18    A.  Moran, they hired me, but they never made the
19 provisions to send me out to -- they are located out
20 of New York or Staten Island.  They never called.        15:54
21 They called.  I interviewed.  I sent in all my
22 information.  They checked it out.  It's a union-type
23 company.  So they were in process of union
24 negotiations or something.  I never heard from them
25 after that.                                              15:54

Page 173

1   Q.  Mr. McKenzie, I appreciate your patience with
2  me. I just have a few more questions and then we'll
3  be done.
4       Do you contend you suffered emotional
5  distress as a result of anything that happened to you          15:54
6  at Petroleum Service Corporation?
7   A.  Yes. I experienced some emotional distress.
8  It's a situation that I find difficult to re-enact
9  from time to time.
10  Q.  Tell me how you contend you've suffered              15:55
11 emotional distress.
12  A.  Well, it's almost made me a little concerned
13 about fairness in the marine industry. It impacted my
14 family life a little bit with the stress of not
15 knowing what we're going to do financially.               15:55
16  Q.  Your wife was always supportive of you,
17 though, wasn't she?
18  A.  Yes, uh-huh.
19  Q.  So the impact on your family life was just
20 worries about losing your job?                            15:56
21  A.  Pretty much just, yes, about losing my job.
22 I did have the support of my wife.
23  Q.  Okay. How else do you contend you have
24 suffered emotional distress?
25  A.  For me to depend on my wife for a moment       15:56

Page 174

1  financially, like I said, that caused a little stress
2  within myself.
3   Q.  Anything else?
4   A.  No.
5   Q.  You said you didn't see any doctor. Did you    15:56
6  take any sort of medicine for emotional distress?
7   A.  No, I did not.
8   Q.  Have you had any physical problems that you
9  attribute to Petroleum Service Corporation?
10  A.  None whatsoever.                                15:57
11  Q.  And I know there is a claim for lost wages
12 and I've got a pretty good handle on that. Are there
13 any benefits that you had with Petroleum Service
14 Corporation that you don't have in your current
15 employment?                                            15:57
16  A.  Are there any benefits?
17  Q.  Do you have hospitalization?
18  A.  Yes, I do.
19  Q.  What about 401(k)?
20  A.  I have 401(k).                                    15:57
21  Q.  Are there any benefits that you had with
22 Petroleum Service Corporation that you don't have now
23 with your current employer?
24  A.  Well, no. They are about the same.
25  Q.  Are there any other -- are there any other      15:57

Page 175

1  damages that you contend you have suffered as a result
2  of anything that you attribute to Petroleum Service
3  Corporation?
4   A.  I attribute me being impacted with my earning
5  potential -- the potential to pursue a career in         15:58
6  liquefied gas transfers versus DL, dangerous liquid
7  transfers, because there are companies that do just
8  liquefied gas transfers.
9   Q.  Who are some of those? Can you tell me.
10  A.  I don't have any of the names right off.         15:58
11  Q.  Anything else? Earning potential I
12 understand. Is there anything else that you contend
13 in terms of damage. You didn't lose a house or a car
14 or anything, did you?
15  A.  No, I did not.                                    15:58
16  Q.  Anything else you can think of in terms of
17 damages?
18  A.  No. Just sort of the stress that I went
19 through and going through not capitalizing on the
20 money that I possibly could have made with PSE and    15:59
21 other employers.
22  Q.  I think you said earlier that you haven't
23 talked to anyone about testifying for you in that
24 case.
25  A.  No, no, I have not.                               15:59

Page 176

1       MR. KIGGANS:  Let's take a quick break
2  and I'm going to check with my two bosses here to the
3  left and see if they have -- see if I missed anything.
4       (Break from 3:59 p.m. he to 4:00 p.m.)
5       MR. KIGGANS:  Mr. McKenzie, those are        16:00
6  all the questions I have. Thank you for your patience
7  and cooperation.
8       THE WITNESS:  Okay. Thank you.
9       (Proceedings concluded at 4:01 p.m.)

Pages 173 to 176

Page 177

```
1              CHANGES AND SIGNATURE
2  WITNESS NAME: ARTHUR McKENZIE, JR.
3  PAGE   LINE    CHANGE                  REASON
4      _____
5      _____
6      _____
7      _____
8      _____
9      _____
10     _____
11     _____
12     _____
13     _____
14     _____
15     _____
16     _____
17     _____
18     _____
19     _____
20     _____
21     _____
22     _____
23     _____
24     _____
25     _____
```

Page 178

```
1          I, ARTHUR McKENZIE, JR., have read the
2  foregoing deposition and hereby affix my signature
   that same is true and correct, except as noted above.
3
4          _____
           ARTHUR McKENZIE, JR.
5          Job No. 77451
6  STATE OF TEXAS    )
   COUNTY OF _____ )
7
           Before me, _____, on this day
8  personally appeared ARTHUR McKENZIE, JR., known to me
   (or proved to me on the oath of _____ or
9  through _____) (description of identity
   card or other document) to be the person whose name is
10 subscribed to the foregoing instrument and
   acknowledged to me that he/she executed the same for
11 the purposes and consideration therein expressed.
12 Given under my hand and seal of office this
   _____ day of _____, _____.
13
14
15
16         _____
           NOTARY PUBLIC IN AND FOR
           THE STATE OF _____
17
```

Page 179

```
1  COUNTY OF HARRIS  )
   STATE OF TEXAS    )
2
3               REPORTER'S CERTIFICATION
4
5          I, Phyllis Loy, Certified Shorthand Reporter
6  in and for the State of Texas, hereby certify that
7  this transcript is a true record of the testimony
8  given.
9          I further certify that I am neither attorney
10 nor counsel for, related to, nor employed by any of
11 the parties to the action in which this testimony was
12 taken.  Further, I am not a relative or employee of
13 any attorney of record in this cause, nor do I have a
14 financial interest in the action.
15         That the amount of time used by each party at
16 the deposition is as follows:
17         Mr. Kiggans - 3 hours, 55 minutes
18         That pursuant to information given to the
19 deposition officer at the time said testimony was
20 taken, the following includes counsel for all parties
21 of record:
22         Ms. Deshonda Charles Tackett, Attorney for
23 Plaintiff, Fax No. 713.227.2827.
24         Mr. Thomas H. Kiggans and Mr. Andrew,
25 Woellner, Attorneys for Defendant, Fax No.
```

Page 180

```
1  225.381.9197.
2          Subscribed and sworn to this August 4, 2009.
3
4
5
6          _____
           PHYLLIS LOY
7          Certified Court Reporter
           In and for the State of Texas
8
9  Certification No. 3301
   Expiration Date:  12/31/10.
```

*[AUTHENTIC COPY watermark: "The original of this file was certified E-Transcript electronically signed using RealLegal technology."]*

Pages 177 to 180

```
 1  COUNTY OF HARRIS )
    STATE OF TEXAS   )
 2
 3          REPORTER'S SUPPLEMENTAL CERTIFICATE
 4
 5          I hereby certify that the witness was
 6  notified on _____ that the witness has 30
 7  days (_____ days per agreement of counsel) after
 8  being notified by the officer that the transcript is
 9  available for review by the witness and if there are
10  changes in form or substance to be made, then the
11  witness will sign a statement reciting such changes
12  and the reasons given by the witness for making them;
13          That the witness signature was/was not
14  returned as of _____.
15          Subscribed and sworn to on this the _____
16  day of _____, _____.
17
18
19
20
                      _____
21                    PHYLLIS LOY
                      Certified Court Reporter
22                    In and for the State of Texas
23
    Certification No. 3301
24  Expiration Date: 12/31/10
25
```